**Marwan BATARSEH, Appellant–
Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 45A03–9211–CR–364.

Court of Appeals of Indiana,
Third District.

Oct. 13, 1993.

Rehearing Denied Nov. 30, 1993.

Transfer Denied Jan. 12, 1994.

Ray L. Szarmach, Szarmach and Fernandez, Hammond, for appellant-defendant.

Pamela Carter, Atty. Gen., Deana M. McIntire, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

HOFFMAN, Judge.

Appellant-defendant Marwan Batarseh appeals from his convictions for theft, a Class D felony, and perjury, a Class D felony.

The facts [1] most favorable to the verdict disclose that in late March of 1991, Milton Thaxton, an employee of American Juice, Inc., (A.J.) located in Gary, Indiana, approached the manager of Batarseh's convenience store and offered to sell him some orange juice. At some point, the manager informed Batarseh of Thaxton's offer which he accepted. Thaxton told Batarseh that he could get as much orange juice as he wanted but that it would be stolen juice. Thaxton also informed Batarseh that the best time to remove the orange juice from A.J. was Sunday when it was closed.

There were four thefts at A.J., all on Sunday: the first on April 21, 1991; the second on April 28, 1991; the third on May

---

1. This Court would note that the Statement of Facts in appellant's brief is a summary of witness testimony rather than a narrative statement. This does not comply with Ind. Appellate Rule 8 .3(A)(5). *Miller v. State* (1983), Ind.App., 449 N.E.2d 1119, 1120.

5, 1991; and the fourth on May 12, 1991. Batarseh provided Thaxton with two vans and a driver so that Thaxton could obtain a larger quantity of orange juice than would be possible by merely using a car. Also, for each of the thefts, Thaxton was assisted by Bruce Bailey, a security guard working at A.J. who allowed Thaxton access to the premises.

The April 21, 1991 and the April 28, 1991 thefts were similar. On each occasion, Thaxton, using Batarseh's vans and driver, delivered four pallets of ten-ounce bottles of orange juice to Batarseh's store. Both times, Batarseh paid Thaxton for the stolen juice.

The next theft occurred on May 5, 1991. So that an even larger quantity could be delivered, Batarseh rented a Ryder truck for Thaxton to use. However, Thaxton encountered problems at A.J. and was only able to supply Batarseh with three pallets of juice on that date. Again, Batarseh paid Thaxton for the juice.

As noted above, the last theft occurred on May 12, 1991. Like the first and second thefts, Thaxton picked up one of Batarseh's vans and the driver and drove to A.J. There, they removed two pallets of orange juice and placed them in the van. The van was then dropped off at Batarseh's store for unloading. Next, Thaxton took Batarseh's second van back to A.J. where the men spotted an unfamiliar car parked in the lot. They ignored the car and removed the orange juice as planned. In this car was an undercover security guard hired by A.J. to investigate the recurrent thefts. The security guard notified the police who attempted to intercept the van on its way back to Batarseh's store. A police chase ensued. Thaxton escaped and was able to alert the manager at Batarseh's store as to what had happened.

After arresting Thaxton and the driver, the police went to Batarseh's store where they found the first van, already unloaded, and the pallets of stolen juice on the floor in the store. Later, Batarseh arrived at the store at which point he was arrested. The orange juice taken from A.J. on May 12, 1991, was returned to A.J. that night.

In November of 1991, Thaxton accompanied Batarseh to the office of Batarseh's attorney. There, Thaxton signed an affidavit which stated in summary that Batarseh had no involvement in the above thefts and that he did not know he was buying stolen juice. Later it was revealed that these statements were false and that Thaxton agreed to sign the affidavit because he thought Batarseh would take care of him and his family financially.

Based on this evidence, a jury convicted Batarseh of theft and perjury, and the court imposed sentence. Batarseh now appeals. The issues presented for our review, as restated, are:

(1) whether the evidence is sufficient to sustain his convictions;

(2) whether his convictions should be set aside due to jury inattentiveness;

(3) whether the trial court erred in admitting into evidence computer generated spreadsheets reflecting A.J.'s total loss for April and May 1991; and

(4) whether the trial court committed error in its order of restitution.

■ Batarseh contends that the evidence is insufficient to sustain his convictions because the jury convicted him based solely upon Thaxton's testimony which he claims is inherently unbelievable. When reviewing a sufficiency claim, we look only to the probative evidence and the inferences reasonably drawn therefrom favoring the verdict to see whether there was evidence to support a finding of guilt beyond a reasonable doubt; we will not reweigh the evidence or judge the witnesses' credibility. *Hilliard v. State* (1993), Ind.App., 609 N.E.2d 1167, 1168.

■ Batarseh maintained at trial and here on appeal that he did not know the juice was stolen. However, at trial, Thaxton testified that Batarseh knew the juice was stolen because he told Batarseh it was. More specifically, Thaxton testified that he told Batarseh that he could supply him with as much juice as he wanted but that it would be stolen juice. As Thaxton's testimony further reveals, upon learning this,

Batarseh did not decline Thaxton's offer. Rather, he provided Thaxton with two vans and a driver and also a Ryder truck on May 5, 1991, so that more juice could be delivered than would be possible by merely using Thaxton's car.

Other evidence in the record lends support to Thaxton's version of the events. At trial, Officer Douglas McKinney, working on night surveillance on Sunday May 12, 1991, testified that he saw Thaxton and Batarseh's driver leave A.J. in Batarseh's van with the stolen juice. He stated that he followed the van to Batarseh's store where he saw the men drop it off and proceed back to A.J. in a second van. McKinney said that when Thaxton and Batarseh's driver were finally apprehended that night, the second van, filled with stolen orange juice was also on route back to Batarseh's store. McKinney's testimony further disclosed that when the police arrived at Batarseh's store, they found the first van, already unloaded, and the stolen orange juice on the floor inside the store.

 In his brief, Batarseh directs our attention to several alleged inconsistencies in Thaxton's testimony regarding when Thaxton met him and what the price was for the orange juice. Batarseh also claims that Thaxton's testimony was inherently unbelievable because he admitted during his second meeting with the FBI that he had previously lied about his involvement in the thefts. However, all of this evidence was before the jury. Ferreting out the truth when faced with conflicting evidence and arriving at a verdict is the jury's function, not ours on appeal. *See Mayhew v. State* (1989), Ind., 537 N.E.2d 1188, 1189–1190. Only when this Court confronts inherently improbable testimony will we impinge on the jury's responsibility to judge the credibility of witnesses. *Rodgers v. State* (1981), Ind., 422 N.E.2d 1211, 1213.

Batarseh's claim that Thaxton's testimony is inherently unbelievable is without merit. Accordingly, there was sufficient evidence for a reasonable jury to determine beyond a reasonable doubt that Batarseh knew the juice was stolen when he purchased it from Thaxton.

 Next, Batarseh contends that his conviction should be set aside due to jury inattentiveness. During Officer Douglas McKinney's testimony, the court questioned juror Buck: "Mr. Buck, you're paying attention, aren't you? You fooled me." Batarseh invites us to speculate from the above colloquy alone that the juror was sleeping. However, the invitation is declined.

Batarseh contends that the trial court erred by admitting into evidence computer generated spreadsheets which reflected the total inventory loss for A.J. between April and May of 1991. On these spreadsheets, the lost inventory was itemized according to juice type. The prices, per case, of the different types of juices were also listed according to bottle size. He claims that these exhibits were both irrelevant and prejudicial.

 The trial court is accorded with wide latitude in ruling on the relevancy of evidence. *Wallace v. State* (1985), Ind., 486 N.E.2d 445, 460, *reh. denied, cert. denied,* 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 723 (1986); *Snider v. State* (1980), 274 Ind. 401, 412 N.E.2d 230, *reh. denied.* This latitude is vested in the trial court to determine the probative value of evidence vis-a-vis its prejudicial impact. *Id.* If the offered evidence is only marginally relevant, it is within the sound discretion of the trial court to determine its admissibility. *Id.* As the State correctly points out, these exhibits were relevant to show the value of the orange juice.

 Batarseh claims that even if relevant, the exhibits were prejudicial because they reflected total inventory loss for A.J. rather than loss due to the four thefts alone. Batarseh argues that the jury, relying on the information in these exhibits, could have improperly held him accountable for all loss of inventory suffered by A.J. during these months rather than those losses attributable only to the thefts.

Tom Hentschel, General Manager at A.J., testified on direct examination and again on cross-examination, that the spreadsheets

reflected all "unaccounted for losses" of inventory for April and May of 1991, and not just those losses due to theft. Moreover, Thaxton's testimony revealed how much stolen juice was actually delivered to Batarseh. As such, the jurors were sufficiently alerted to facts which would preclude them from holding Batarseh accountable for all losses suffered by A.J. during April and May of 1991.

Lastly, Batarseh contends that the trial court's order of restitution is in error because it is not supported by an adequate factual basis. The trial court sentenced Batarseh to two years for theft and two years for perjury. The sentences were to run concurrently and were suspended. Batarseh was placed on probation for a period of two years. As a condition of probation, Batarseh was ordered to pay $29,285.81 in restitution to A.J. Batarseh claims that the restitution order is contrary to Indiana law, in that the restitution amount exceeds A.J.'s actual loss resulting from the four thefts.

IND. CODE § 35–38–2–2(a)(5) (1990 Supp.), recodified without substantive change in 35–38–2–2.3(a)(5) (effective April 23, 1991), states in pertinent part that as a condition of probation, "the court may require" a defendant to "make restitution or reparation to the victim of his crime for the damage or injury that was sustained." This language implies that restitution must reflect actual loss incurred by a victim. *Smith v. State* (1984), Ind.App., 471 N.E.2d 1245, 1247–1248, *trans. denied.* The amount of actual loss is a factual matter which can be determined only upon the presentation of evidence. *Id.*

In *Smith*, the trial court found Smith guilty of battery and ordered him to pay $284.80 in restitution to the victim. There, the only evidence of the extent of injury was the sworn statement of the prosecutor that medicals were $284.80. No specific evidence was presented to the trial court to show that medical expenses were incurred by the victim as a result of Smith's battery. Accordingly, the case was remanded.

More recently, it has been held that a trial court cannot base its order of restitu-tion on illicit uncharged acts. *Hipskind v. State* (1988), Ind.App., 519 N.E.2d 572, 574. In *Hipskind*, the trial court ordered restitution in the amount of $10,000.00. However, the total amount of loss proven to be attributable to the defendant's charged crimes was only $1,012.04. As such, the maximum amount of restitution which could have been ordered was $1,012.04. Because the trial court's order exceeded this amount, the case was remanded.

Here, A.J., by Hentschel, requested $42,384.01 in restitution. Hentschel testified that this amount reflected a combination of the April and May losses of product stolen from A.J. and the cost of additional security surveillance needed to apprehend the juice thieves.

As mentioned earlier, the computer printouts produced by A.J. showed that during April and May of 1991, A.J.'s total losses were $14,311.32 and $14,974.49 respectively. The price of the juice, per case, was listed on these printouts and categorized as to juice type and bottle size. Additionally, Hentschel testified that A.J. spent $13,098.20 on extra security to catch the thieves. As the State notes, it is unclear from the record whether this amount was considered as part of the restitution order.

Also presented at trial was evidence as to the amount of juice delivered to Batarseh. The evidence in the record discloses that Batarseh received from Thaxton four pallets of orange juice on April 21, 1991; four pallets of orange juice on April 28, 1991; three pallets of orange juice on May 5, 1991. All the orange juice taken on May 12, 1991 was returned to A.J.

The amount of restitution ordered by the court was $29,285.81, equal to the amount of A.J.'s total losses for April and May of 1991. Hentschel testified on cross-examination that although after Thaxton and Batarseh were apprehended, the losses at A.J. decreased to virtually nothing, he was not sure that all the unaccounted for orange juice, reflected by the April and May 1991 losses, went to Batarseh's store.

Based on these facts, it appears that the amount of restitution ordered by the trial court is in excess of the actual loss proved by A.J. attributed to Batarseh. Therefore, this cause is reversed and remanded on the issue of restitution with instructions to the trial court to revise its restitution order in accordance with this opinion.

Affirmed in part; reversed and remanded in part.

GARRARD and SULLIVAN, JJ., concur.